**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| | ) | |
| | ) | |
| VELMA WESTBROOK, | ) | No. 16 C 5685 |
| | ) | |
| Plaintiff, | ) | Judge Virginia M. Kendall |
| | ) | |
| v. | ) | |
| | ) | |
| ILLINOIS DEPARTMENT OF HUMAN | ) | |
| SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Velma Westbrook brought this suit against her former employer Illinois Department of Human Services (IDHS) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, alleging claims of disparate treatment on the basis of her sex and race and a claim for hostile work environment. Specifically, Westbrook, an African American female, alleges that a resident of an IDHS facility made racially derogatory comments to her on a continuous basis and attempted to attack her on one occasion and that IDHS refused to transfer her away from the resident and into a different unit. IDHS moved for summary judgment on all of Westbrook's claims. Westbrook subsequently withdrew her sex and race discrimination claims, leaving only her hostile work environment claim. For the following reasons, IDHS' Motion for Summary Judgment on the hostile work environment claim [34] is granted.

## BACKGROUND

The Court takes the relevant facts from the parties' Local Rule ("LR") 56.1 statements of undisputed material facts and supporting exhibits: (1) Defendant Illinois Department of Human Services' Local Rule 56.1(a)(3) Statement of Facts and Exhibit Index (Dkt. No. 34); Plaintiff's

Local Rule 56.1(b)(3)(B) Response to Defendant's Statement of Material Facts (Dkt. No. 42); Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts (Dkt. No. 43); and Defendant's Response to Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts (Dkt. No. 54.) The following facts are undisputed except where otherwise noted.

## I. Westbrook's Employment with IDHS Generally

Westbrook, an African American female, has been employed by IDHS as a Security Therapy Aide I (STA I) since 2001, working at all times in Forensic Treatment Programs (FTPs) at IDHS facilities. (Dkt. No. 42 at ¶ 3.) FTPs house individuals who have been committed by a criminal court after being found not guilty by reason of insanity. (*Id.* at ¶ 4.)

As an STA I, Westbrook's job duties include de-escalating resident behavior, preventing residents from harming themselves or others and documenting inappropriate behavior in residents' progress notes. (*Id.* at ¶ 9.) When she became an STA I, Westbrook received three months of training during which she learned how to deal with disruptive residents, restrain combative residents and defend herself against resident attacks. (*Id.* at ¶¶ 7, 9.) Westbrook was trained to ask a disruptive resident to go to his or her room to calm down and, if he or she refused, to call for security to come and temporarily remove the resident from the unit. (*Id.* at ¶ 9.) Westbrook was also trained to make entries in residents' progress notes whenever a resident behaved inappropriately or security had to be called. (*Id.* at ¶ 15.) During her nearly ten years of working with mentally ill patients in her two positions, Westbrook observed patients assault others at least once a month, and sometimes weekly, and regularly worked with patients who said hurtful or offensive things to staff members. (*Id.* at ¶¶ 11-13.) Westbroook testified, with respect to her job responsibilities and training, "When I took the job . . . I knew that I was dealing with mentally ill people" and "the training is to help us understand how to deal with the

residents that have mental illness and not to let them . . . distract us from doing our job." (*Id.* at ¶ 8.)

Westbrook's first STA I position with IDHS was at the Joliet Treatment and Detention Center where she worked from 2001 until 2006 when the facility closed and she was laid off. In 2007, she began working at Elgin Medical Health Center (EMHC) where she is currently employed. (*Id.* at ¶ 10.) The EMHC FTP is divided into various units. (*Id.* at ¶ 6.) Westbrook worked in the H&I unit from 2007 until 2009, the Pinel unit from 2009 until 2013, the M&N unit for several months in 2013, and the William White unit from November 2013 until October 30, 2014. (*Id.* at ¶¶ 6, 12-14.) Westbook's immediate supervisor in the William White unit was Nursing Supervisor Ryma Jacobson. (*Id.* at ¶ 49.)

Westbrook is a member of a union. (*Id.* at ¶ 5.) Per union rules, members must bid on assignments in IDHS and bids are granted based on seniority. (*Id.*) Sometime after April 2014, Westbrook submitted bids for positions outside of the William White unit and, in September or October 2014, was awarded the first position that she bid on. (*Id.* at ¶ 64.) Westbrook started the new position in February 2015. (*Id.* at ¶ 65.)

Westbrook's claims arise from her time working as an STA I in the William White unit.

## II. Alleged Racially Offensive Conduct

Marci Webber was admitted to the EMHC on June 18, 2012 after being found not guilty by reason of insanity for first degree murder of her 4-year-old daughter. (*Id.* at ¶ 23.) Webber was placed in the William White unit but did not trust her treatment team and regularly wrote letters to hospital staff requesting to be transferred to another unit. (*Id.* at ¶ 29.) Westbrook had frequent contact with Webber while she was housed in the William White unit including, for example, that she assisted her in making phone calls. (*Id.* at ¶¶ 47, 60; Dkt. No. 54 at ¶ 2.)

Westbrook testified that between April 10, 2014 and October 2014, Webber continuously called her racially derogatory names—for example, "black bitch," "nigger" and "black cow"—and, on May 3, 2014, attempted to physically attack her.  (Dkt. No. 42 at ¶¶ 39, 41, 49; Dkt. No. 54 at ¶¶ 2, 3.)  Although her patient logs reflect three instances in which Webber was racially abusive to her, Plaintiff testified that she recalls six specific instances in which Webber called her racial slurs or other derogatory names.  (Dkt No. 42 at ¶ 44.)  Specifically, Westbrook testified about or described in her written discovery responses the following incidents:

- Around 4:00 p.m. on June of 2014, Webber refused to allow Westbrook to take her for a phone call, calling Westbrook a "bitch" and saying, "I don't want that nigger bitch to call my lawyer for me."  Another STA and Jacobson, Westbrook's immediate supervisor, witnessed this incident.  (Dkt. No. 54 at ¶ 4.)

- On June 14, 2014, Webber was hostile with and threatened Westbrook, calling her a "black bitch."  (*Id.* at ¶ 5.)

- On June 25, 2014, Webber called Westbrook a "black Nigger" and attempted to attack Westbrook with an object in her hand.  As a result, Westbrook had to call security to the unit. This was the first and only time Westbrook had to call security on a resident of the William White unit.  (*Id.* at ¶ 6.)

- Around 7:30 a.m. on a day in September 2014, while Westbrook was in the day room, Webber became angry with another staff member and took it out on Westbrook, calling Westbrook an "ugly black bitch." (*Id.* at ¶ 7.)

- On another day in September 2014, Webber entered the dining hall while Westbrook was serving lunch, called Westbrook a "black cow" and stated, "sorry nigger bitch, go back to the prison where you use to work at, cause bitch this is not a prison."  Westbrook's co-worker was present and witnessed the incident. (*Id.* at ¶ 8.)

- On September 15, 2014, Webber called Westbrook a "nigger" two or three times and threatened to call her attorney and the Office of Inspector General (OIG) about Westbrook.  Jacobson was present at the time but did nothing.  That same day, when Jacobson was not present, Webber stated something along the lines of "fucking black nigger parents," in reference to Westbrook's deceased parents. (*Id.* at ¶ 9.)

Westbrook testified that there were "many, many more" other such instances that occurred but that she could not specifically recall.  (*Id.* at ¶ 1.)  During the five months that Westbrook alleges

that she worked in a hostile work environment, Westbrook was off on FMLA leave for over two months.  (*Id*. at ¶40).

Westbrook was required to report any inappropriate behavior in Webber's progress notes. (Dkt. No. 42 at ¶¶ 15, 42.)  Westbrook testified, however, that many of the instances of Webber's racially offensive conduct were not documented in her notes.  (*Id.* at ¶ 43.)  In fact, Westbrook made 13 entries in Webber's progress notes between January and October 2014, only three of which report that Webber made racist comments.  (*Id.* at ¶ 46.)  Meanwhile, Webber routinely wrote letters to hospital staff requesting to be transferred off of the William White unit, expressed distrust in the treatment team and reported belief that the treatment team was causing the staff to write negative things in her chart. (*Id.* at ¶ 30.)  Between November 2013 and October 2014, Webber filed 13 OIG complaints accusing staff members of abuse and neglect, Westbrook was named in three of those complaints. (*Id.* at ¶ 31.)

Westbrook claims that the hostile work environment occurred between April 2014The and continued through the filing of her First Amended Complaint in October 2016.  Westbrook's last note reporting racist conduct was entered on May 16, 2014.  (*Id.*)  Westbrook testified, however, that at one point Jacobson instructed her to stop documenting Webber's misbehavior and to allow other staff members to do so instead.  (*Id.* at ¶ 62; Dkt. No. 34 at Ex. 3, 247:24-252:14.)

**III. Westbrook's Requests for Transfer**

Westbrook also testified that during that same period between April 2014 and October 2014, she requested several times to be transferred from the William White unit to another unit. Westbrook estimated that she made a total of ten requests for transfer.  (Dkt. No. 54 at ¶ 19.) She specifically recalls making five oral requests for transfer to Jacobson in April, May, June,

September and October of 2014.  (Dkt. No. 42 at ¶ 49.)  As Westbrook recalls, in most instances, Jacobson either did not respond or responded, "OK."  (Dkt. No. 42 at ¶ 49.)  For example, Westbrook testified that on April 12, 2014, she made a request to Jacobson that she be reassigned to a different unit due to the racially hostile work environment, stating "I can't take this anymore. I need you to transfer me to another unit" and that Jacobson walked away without responding. (Dkt. No. 54 at ¶ 10.)  Westbrook testified, however, that when she requested a transfer in September 2014, Jacobson responded, "The resident would be getting what she wanted if we move you."  (*Id.* at ¶ 15.)

Westbrook claims that she also made requests to transfer to Assistant Director of Nursing Diana Hogan.  Westbrook testified that she left between two and four voicemails for Hogan about transferring—but could not recall the specific content of the voicemails—and made a written request for transfer to Hogan on June 14, 2014.  (*Id.* at ¶¶ 51, 52; Dkt. No. 54 at ¶¶ 11, 12.)  Westbrook testified that Hogan never responded to her requests and that she never had a conversation with Hogan about transferring.  (Dkt. No. 42. at ¶ 51; Dkt. No. 54 ¶ 12.)

It is undisputed that Hogan and Westbrook exchanged emails in June and July of 2014 regarding Westbrook's previous request for a shift change pertaining to a different issue.  (*Id.* at ¶¶ 53-54.)  In 2013, Westbrook obtained an order of protection against her abusive ex-husband. (*Id.* at ¶ 55.)  At the time, Westbrook worked the night shift and her ex-husband worked the day shift.  (*Id.*)  Westbrook requested a transfer to the day shift and Hogan complied because she did not want Westbrook to be at the facility at night, when the ex-husband was off work.  (*Id.*) Hogan also circulated a memo alerting other EHMC staff members to be on the lookout for Westbrook's ex-husband in case he came to the facility.  (*Id.*)  On June 19, 2014, Hogan sent an email to Westbrook following up on that previous shift change.  (*Id.* at ¶ 53.)   Westbrook

responded on June 22, 2014 and July 9, 2014, thanking Hogan for the change. (*Id.* at ¶ 54.) In those emails in June and July of 2014, however, Westbrook never mentioned the abuse by Webber, any request for transfer from the unit, or any written request for transfer which she says she submitted to Hogan just days before this email exchange. (*Id.*)

Westbrook stated in written discovery responses that she also made an oral request for transfer to the OIG in September 2014 and was not transferred. (Dkt. No. 54 at ¶ 16.) Westbrook never made any request for transfer to the Director of Nursing. (Dkt. No. 42 at ¶ 58.)

Westbrook testified that her supervisor, presumably Jacobson, had discretion to transfer her off of an assigned unit to another unit. (Dkt. No. 54 at ¶ 34.) She testified that nothing in the Collective Bargaining Agreement (CBA) governing the union bidding process prevented the transfer she requested and that the CBA provided exceptions from the regular process for "hardship transfers." (*Id.* at ¶¶ 34-35.)

## IV. Complaints to IDHS about Webber

IDHS denies receiving any complaint from Westbrook regarding Webber's behavior. (*Id.* at 50.) The discrimination policy set forth in the IDHS employee handbook states:

> An employee . . . who either observes or believes . . . herself to be the object of discrimination or harassment should immediately contact the DHS Bureau of Civil Affairs for consultation or to file a written internal charge, without fear of retaliation. . . .

> It is the responsibility of all supervisors and managers of DHS to address all observed or reported incidents or complaints of discrimination and/or harassment by taking appropriate and prompt action to investigate, report, and terminate all such incidents.

(*Id.* at ¶ 59; Dkt. No. 54 at ¶ 38.) Westbrook never filed a complaint with the Bureau of Civil Affairs regarding Webber's behavior; nor did she file a union grievance about Webber. (Dkt. No. 42 at ¶¶ 57, 59.)

Westbrook testified that Jacobson witnessed Webber call her a "black bitch" four or more times and a "nigger" two or three times. (Dkt. No. 54 at ¶ 17.) She also testified that each time she made a request for a transfer to Jacobsen, she reported Webber's racially offensive conduct, unless Jacobson herself had witnessed the behavior. (*Id.* at ¶ 18.) Finally, Westbrook testified that Hogan knew about Webber's racial comments because Hogan received an email report each day from each unit and Westbrook had seen these emails. (*Id.* at ¶ 12.)

IDHS enacted some changes to reduce Westbrook's interactions with Webber. For example, on June 14, 2014, the Director of the Forensics Program at EMHC, Jeff Pharis, directed that Westbrook no longer accompany Webber during phone calls because Webber had frequently become explosive when Westbrook confronted her regarding inappropriate phone use. (Dkt. No. 42 at ¶ 60.) Additionally, following one OIG complaint made by Webber about Westbrook, IDHS transferred Westbrook from the female side of the William White unit to the male side of the unit while the complaint was investigated. (*Id.* at ¶ 61.) Westbrook testified, however, that she still interacted with Webber while on the male side. (Dkt. No 54 at (Dkt. No. 54 at ¶ 40; Dkt. 34 at Ex. 3, 245:7-255:2.) Finally, at some point in 2014, charge nurses and other STAs began interacting with Webber more often thereby reducing the number of interactions between Webber and Westbrook. (Dkt. No. 42 at ¶ 63.)

## V. Complaints by Webber against Westbrook

Webber complained about Westbrook to her attorney and the OIG. On August 5, 2014, Webber filed a suit under 42 USC § 1983 against multiple EMHC employees including Westbrook. (*Id.* at ¶ 30.) In the action, Webber alleged Westbrook told her she would "make stuff up and put it in her chart." (*Id.*)

Between December 2013 and October 2014, Webber also filed 13 complaints with the IDHS OIG alleging abuse and neglect by various staff members.  (*Id.* at ¶ 31.)  Three of the complaints named Westbrook as an offender including her complaint filed October 25, 2014 against Westbrook in which Webber alleged that Westbrook told her to kill herself and threatened to get a knife and cut her throat.  (*Id.* at ¶¶ 31-32.)  Webber's attorney provided the OIG an affidavit from another resident claiming to have witnessed Westbrook threaten Webber.  On October 27, 2014, Webber's attorney filed a motion for an emergency order of protection seeking Westbrook's removal from the William White unit.  (*Id.* at ¶¶ 33-34.)  On October 29, 2014, a local newspaper reported that an unidentified EMHC employee had allegedly threatened to kill Webber.  (*Id.* at ¶ 35.)

## VI. Paid Administrative Leave

On October 30, 2014, IDHS placed Westbrook on administrative leave while the complaint was investigated.  (*Id.* at ¶¶ 36-37.)  Per IDHS policy, "administrative leave" is a "timekeeping status" and is not disciplinary; Westbrook received full pay while on leave.  (*Id.* at ¶¶ 22, 31-32; Dkt. No. 34 at Ex. 5.)[1]  Westbrook was reinstated in February 2015, after the OIG determined Webber's claims were unfounded.  (*Id.* at ¶ 38.)  Westbrook did not return to the William White unit; rather, she started a new position she had previously been awarded through the bidding process.  (Dkt. No. 42 at ¶ 65.)

Westbrook testified that she began experiencing severe emotional distress due to her hostile work environment beginning in April 2014, at which point she also began speaking with her husband about what she was going through.  (Dkt. No. 54 at ¶ 24.)  She testified that, before going on leave, she was extremely irritable with her husband and family and at times had trouble

---

[1] Westbrook does not consider the administrative leave to be a discriminatory action and confirmed on the record that the administrative leave is not one of the bases for her claim against IDHS. (Dkt. No. 42 at ¶ 37.)

sleeping when reflecting upon Webber's treatment of her. (*Id.* at ¶¶ 24, 25.) Westbrook testified that, after being placed on leave, she became depressed, frequently cried, lost interest in running, cooking and religion, gained weight, was unable to manage her type II diabetes, and needed psychiatric treatment. (Dkt. No. 42 at ¶ 48.)

## STANDARD OF REVIEW

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts do not weigh the evidence or make credibility determinations when deciding motions for summary judgment. *See Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). Rather, the Court must "construe all factual disputes and draw all reasonable inferences in favor of [] the non-moving party." *Cole v. Bd. of Trustees of N. Ill. Univ.*, 838 F.3d 888, 895 (7th Cir. 2016), *cert. denied*, 137 S.Ct. 1614 (2017). "A factual dispute is genuine only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation omitted). The initial burden is on the moving party to inform the district court why a trial is not necessary. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "Upon such a showing, the nonmoving party must 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 322.) In other words, summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal quotations omitted).

<u>**DISCUSSION**</u>

To succeed on a "hostile work environment" claim, Westbrook must show that: "(1) she was subject to unwelcome harassment; (2) the harassment was based on her race; (3) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability." *Luckie v. Ameritech Corp*., 389 F.3d 708, 713 (7th Cir. 2004); *see also Hrobowski v. Worthington Steel Co*., 358 F.3d 473, 476 (7th Cir. 2004). IDHS argues that summary judgment is appropriate because Westbrook cannot show the third and fourth elements—that Webber's conduct created a sufficiently hostile or offensive work environment and that there is a basis for employer liability.

## II.     Hostile or Offensive Work Environment

To establish the third element, Westbrook must show that the conduct she was subject to was "sufficiently severe or pervasive to alter the conditions of [her] employment and create a hostile working environment." *Alexander v. Casino Queen, Inc*., 739 F.3d 972, 982 (7th Cir. 2014) (quoting *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21-22 (1993)). This element "has both an objective and subjective component." *Luckie*, 389 F.3d at 714; *see also Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008). "In other words, the environment must be one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Yancick v. Hanna Steel Corp*., 653 F.3d 532, 544 (7th Cir. 2011); *see also Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002).

"To determine whether an environment is objectively hostile or offensive, the court must consider all the circumstances, including frequency and severity of the conduct, whether it is humiliating or physically threatening, and whether it unreasonably interferes with an employee's

work performance." *Luckie*, 389 F.3d at 714. "Courts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Hall v. City of Chicago*, 713 F.3d 325, 331 (7th Cir. 2013) (quoting *Mason v. S. Ill. Univ. at Carbondale*, 633 F.3d 1036, 1045 (7th Cir. 2000)). "Instead, a look at the totality of the circumstances must be had." *Id.*

Westbrook described six specific incidents in which Webber called her a "nigger bitch," "black bitch," "black Nigger," "ugly black bitch," "black cow," or "nigger" and testified that there were several similar instances that she could not specifically recall. Westbrook also made written reports of three such instances in Webber's progress reports. Finally, Westbrook complains that Webber was aggressive and hostile toward her and, on one occasion, attempted to physically attack her.

The Seventh Circuit has recognized that "[g]iven American history . . . the word 'nigger' can have a highly disturbing impact on the listener" and "thus, a plaintiff's repeated subjection to hearing that word could lead a reasonable factfinder to conclude that a working environment was objectively hostile." *Hrobowski*, 358 F.3d at 477. For example, in *Hrobowski*, the plaintiff complained that she was "repeatedly subjected to hearing the word 'nigger,' including more than one occasion in which a fellow supervisor suggested that he talk to an employee 'nigger to nigger.'" *Id.* The court held that a reasonable juror could find that co-employees' frequent use—*i.e.*, on more than one or two occasions—of the word "nigger" created an objectively hostile work environment. *Id*; *see also Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 912 (7th Cir. 2010) (reasonable factfinder could find work environment objectively hostile where coworkers called plaintiff a "black bitch" and a "nigger" on multiple occasions over a period of three months).

Here, Westbrook submitted evidence that she was frequently subjected to hearing the word "nigger" and similar derogatory terms from a patient. She also testified that Webber made comments directly to her and not that she merely heard them secondhand. *See Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004) ("[I]n determining whether remarks 'objectively' create a hostile work environment we must assess whether the remarks were stated directly to the plaintiff or whether the plaintiff heard them secondhand.") (internal citations omitted); *c.f. Smith*, 388 F.3d at 567 (hearing from others about racist comments directed at third parties does not amount to objectively hostile work environment); *Maldonado v. Invensys Bldg. Sys., Inc*., 157 F. App'x 904, 906 (7th Cir. 2005) (evidence failed to satisfy objective test where racial comments "were infrequent," "not directed at [plaintiff]" and "[plaintiff] overheard or was told about them").

However, the source of the comments also matters. *See, e.g.*, *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017) (quoting *Robinson v. Sappington*, 351 F.3d 317, 330 (7th Cir. 2003)) ("The specific circumstances of the working environment and the relationship between the harassing party and the harassed . . . bear on whether that [objectively hostile] line is crossed."); *Dandy*, 388 F.3d at 271 (7th Cir. 2004) (quoting *Rodgers v. Western–Southern Life Ins. Co*., 12 F.3d 668, 675 (7th Cir.1993)) ("[A] supervisor's use of the term ["nigger"] impacts the work environment far more severely than use by co-equals."). In *Hrobowski* and other cases finding that the repeated use of the word "nigger" is sufficient evidence of an objectively hostile work environment, a supervisor or co-employee made the racist comments. *See, e.g.*, *Hrobowski*, 358 F.3d at 477 (employees and fellow supervisors frequently used the word "nigger"); *see also Chaney*, 612 F.3d at 912 (coworkers used the terms "black bitch" and "nigger" on multiple occasions); *Cerros v. Steel Techs., Inc.,* 288 F.3d 1040, 1044 (7th Cir. 2002) ("co-employees as

well as managers directed racial epitaphs toward plaintiff"). Here, Westbrook alleges that a mentally ill resident under her supervision made the comments at issue.

IDHS argues that Webber's behavior consisted solely of the kinds of resident conduct Plaintiff was hired and trained to handle and, therefore, could not have altered the conditions of her employment or created an objectively hostile working environment. (Dkt. No. 34-1 at 10-11.) In short, IDHS argues that Westbrook was hired to deal with mentally ill patients who were so mentally ill that they were not able to proceed to trial in the criminal courts because they would not understand the proceedings due to their illnesses. In order to prepare her for this challenging job, Westbrook was provided with three months of training to deal with what was inevitably going to be a job filled with daily patient altercations, outbursts, and potential assaults on staff. As such, she was hired into a working environment that might be inherently hostile and she was trained to deal with that. IDHS relies on *E.E.O.C. v. Nexion Health at Broadway, Inc.* for this argument. 199 Fed. App'x. 351 (5th Cir. 2006). In *Nexion*, the plaintiff, a certified nurse's assistant, worked at a nursing home for elderly persons with mental conditions where he cared for a resident who made offensive, racial comments—including using the word "nigger"—to him about three to four times a week. *Id.* at 352. In considering the totality of the circumstances, the Fifth Circuit found that the instances were "not so frequent as to pervade the work experience of a reasonable nursing home employee, especially considering their source" and were neither physically threatening nor harassing. *Id.* at 353. The court found further that the harassment did not objectively interfere with the plaintiff's work performance or undermine his workplace competence because "his job required him to deal with the tragic failings of elderly people whose minds have essentially failed" and "[a]bsorbing occasional verbal abuse from such patients was not merely an inconvenience associated with his job; it was an important

part of the job itself." *Id.* at 354.  Accordingly, the Fifth Circuit held that no rational factfinder could find the employer liable for providing a hostile work environment.  *Id.* at 354.

Other courts have reached the same conclusion in hostile work environment claims based on sexual harassment.  For example, in *Gardner v. CLC of Pascagoula, LLC*, the plaintiff, a certified nursing assistant at a senior living center, complained that an elderly resident made sexually explicit comments to her, attempted to grope her and punched her three times.  No. 15 C 423-LG-RHW, 2017 WL 487031, at *1 (S.D. Miss. Feb. 6, 2017).  Citing *Nexion*, the district court held that "it cannot be unreasonable for an employee trained to handle combative, sexually aggressive patients to encounter a combative, sexually aggressive patient."  *Id.* at *8.  The district court noted that the plaintiff had agreed to work with elderly, mentally diseased patients, was aware of the patient's behavior before being assigned to his care and had not been singled out by the patient because the patient was abusive to any nurse who cared for him.  *Id.*  Similarly, in *Pickett v. Sheridan Health Care Ctr.*, the plaintiff, a housekeeper at a nursing home, complained of three incidences of sexual harassment by elderly residents that included verbal threats, humiliation, and unwanted touching.  No. 07 C 1722, 2008 WL 719224, at *4 (N.D. Ill. Mar. 14, 2008).  The district court granted summary judgment on other grounds but noted that it was "reluctant, given the context of a nursing home providing care for residents with mental illnesses, to conclude that three instances of inappropriate resident conduct over the course of eight months are sufficiently severe or pervasive" to establish an objectively hostile work environment."  *Id.*

In *Aguiar v. Bartlesville Care Center*, the Tenth Circuit held that a reasonable trier of fact *could* find that the alleged sexual harassment by a resident of a care center created a hostile work environment.  No. 10-5002, 2011 WL 1461541 (10th Cir. Apr. 18, 2011).  In *Aguiar*, the

plaintiff, a certified nurse assistant whose job it was to distribute medicine to residents, complained that one resident made inappropriate sexual comments toward her, incessantly groped her and ultimately assaulted her by shoving a medicine cart into her while in the hallway. *Id.* at *3-4. The resident was a diabetic and had a prosthetic leg but no mental impairments; unbeknownst to the plaintiff, he also had a pending criminal case on charges for domestic abuse, assault, battery, and violation of a protective order. *Id.* at *3. The Tenth Circuit distinguished the facts from cases like *Nexion*, finding that the resident was not mentally impaired, the plaintiff had not agreed to care for him with full knowledge of all relevant facts, and the resident's conduct was more egregious than repeated crude and disparaging comments. *Id.* at *5. The Tenth Circuit held that a rational trier of fact could find a hostile work environment. *Id.*

Westbrook's claims, similar to those in *Nexion*, *Gardner*, and *Pickett*, allege a hostile work environment based on six instances of comments spread over two years. The source of the comments is a criminally insane patient who aggressively reacts to her treatment team by filing multiple OIG complaints against them (many others, not solely Webber) and has even brought suit based upon her mental state that has her believing that the team is attempting to harm her. Webber is hospitalized after killing her child while acting with some delusional belief that the child needed to be killed. This mentally ill, aggressive and delusional patient is exactly the kind of patient housed by the IDHS. Directly preparing her to work with this tragic scenario, Westbrook received training to protect herself and others, document the abnormal behavior and comments. There is no doubt that the insults were offensive and there is no dispute that Webber attempted to attack her on one occasion. However, Westbrook was specifically hired and trained to handle mentally ill people prone to be disruptive and to physically attack others. It was a core part of her position that she would be subjecting herself to behavior that is not deemed

acceptable in society.  The patients, unlike the elderly patients in *Nexin*, who might have some degenerative brain functioning and/or senility and might be offensive; *all* of the patients that Westbrook signed up to care for were hospitalized for not being able to comport their behavior to societal norms even to the point of not being accountable for their often-serious crimes.  Similar to the plaintiff in *Nexion*, absorbing and responding to verbal and physical abuse "was not merely an inconvenience associated with [the] job; it was an important part of the job itself." 199 Fed. App'x. at 354.  Beyond *Nexion*, plaintiff was guaranteed to confront this aggressive behavior and was trained to combat it.  Given the totality of the circumstances, no reasonable factfinder could find Webber's behavior so severe or pervasive as to alter the conditions of Westbrook's employment and create a hostile working environment.  Accordingly, summary judgment on the third element is appropriate.

## III.    Basis for Employer Liability

An employer can be liable under Title VII for a hostile work environment created by a third-party non-employee.  *Dunn v. Washington Cty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005). This is because, under Title VII, an employer is responsible for "any . . . discriminatory term or condition of employment that the employer fails to take reasonable care to prevent or redress." *Id.*  "The genesis of inequality matters not; what *does* matter is how the employer handles the problem."   *Id.*  Where the harasser is a third party, the Court applies the negligent standard to employer liability:  the plaintiff must show that the employer (1) knew of the problem, and (2) did not act reasonably to equalize the working conditions once it had knowledge.  *Id.*; *see also Cole*, 838 F.3d at 898 (plaintiff must show the employer failed to take "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring"); *Hrobowski,* 358 F.3d at 477 ("[P]laintiff must show employer has been negligent either in discovering or

remedying the harassment") (quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998)); *Vance v. Ball State Univ.*, 646 F.3d 461, 471 (7th Cir. 2011), *aff"d*, 570 U.S. 421 (2013) ("Once aware of workplace harassment, 'the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.'") (quoting *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004)).

IDHS contends that Westbrook cannot establish employer liability because she failed to take reasonable steps to put IDHS on notice of the alleged hostile work environment. (Dkt. No. 34-1 at 13-15.) An employer "is not liable for co-employee"—or in this case, third-party— "racial harassment 'when a mechanism to report the harassment exists, but the victim fails to utilize it.'" *Yancick*, 653 F.3d at 549 (quoting *Durkin v. City of Chi.*, 341 F.3d 606, 612-13 (7th Cir. 2003). Westbrook admits that she did not file a complaint with the Civil Rights Bureau and, therefore, did not utilize the mechanism for reporting harassment set forth in IDHS employee handbook.

"A complainant, however, need not specifically comply with the company's internal procedure if the employer is adequately put on notice of the prohibited harassment." *Id.* at 549. Therefore, the plaintiff can "either follow[] the harassment policy reporting requirements or report[] 'the alleged harassment to anyone who had the authority to deal with the harassment or at least to someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.'" *Id.* at 549 (quoting *Parkins*, 163 F.3d at 1037).

IDHS argues that Westbrook cannot show she sufficiently reported the alleged harassment because she complained about Webber's racially offensive conduct only to Jacobson, a low-level supervisor with no authority to deal with the harassment. (Dkt. No 34-1 at 13; Dkt.

No. 53 at 9-10.) IDHS argues also that, given Jacobson's demonstrated unwillingness to address the situation, Westbrook could not reasonably expect that Jacobson would refer the complaint up the ladder to an employee authorized to act on it. (*Id.*) Indeed, IDHS denies receiving any complaints from Westbrook about Webber.

Although the Court agrees that Westbrook has not shown that Jacobson had the authority to deal with the harassment or could reasonably be expected to refer the complaint up the ladder to someone authorized to act on it, the Court need not resolve the issue due to the previous finding that a hostile work environment could not have existed where the Plaintiff was trained and hired to deal with the exact environment of which she complains. In the interest of completeness, however, the Court notes that Westbrook testified that Jacobson had the discretion to transfer her out of the unit but failed to support that subjective belief with any evidence. Westbrook claims that Jacobsen repeatedly ignored the conduct of Webber and did not listen to her complaints and did nothing about it. Yet, Westbrook knew that the correct person to go to for shift changes was Diana Hogan, the Assistant Director of Nursing. She knew this because she had successfully requested changes in the past from Hogan. Instead of following the policy for complaints, Westbrook instead relies on what she believes if Jacobsen's ability to move her without any justification for this. Surely after the first few months of Jacobson's demonstrated indifference, Westbrook could not reasonably expect that Jacobson would report the racially offensive conduct to her superiors. *See, e.g., Yancick*, 653 F.3d at 549 ("Given [immediate supervisor]'s limited duties and authority, [plaintiff's] awareness of [employer]'s harassment policy and chain of command, and [immediate supervisor]'s unwillingness and refusal to address the situation, it was unreasonable for [plaintiff] to believe that [immediate supervisor] would convey his complaints up the ladder.").

19

More importantly, Westbrook failed to show that she notified any other supervisor, of Webber's racially offensive conduct. Webber testified that she requested a transfer from Assistant Director Hogan and from Jennett Heilsberg of the OIG but she does not claim or submit evidence suggesting that she notified either Hogan or Heilsberg that Webber's racial comments were the reason for her request. *See, e.g., Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 849 (7th Cir. 2008) (email to supervisor and to Human Resources complaining about co-worker but not containing allegations of discrimination failed to sufficiently notify employer). Westbrook relies only on her *belief* that Hogan knew of Webber's racial comments based on the fact that each day Hogan received email reports from each unit. Evidence that Hogan received daily reports from each unit, without more, hardly shows that Hogan knew of Webber's conduct. Rather, the fact that Hogan accommodated Westbrook's previous shift change request for protection from her ex-husband suggests that, if Hogan had been aware of Webber's conduct, she would have acted. Westbrook also testified that the Director of the Forensics Program at EMHC, Jeff Pharis, knew Webber frequently became angry with and "explosive" toward Westbrook over issues related to phone use. But nothing in the record suggests that Pharis also knew Webber made any racist comments toward Westbrook. While IDHS clearly knew that the relationship between Westbrook and Webber was contentious—after all, Westbrook filed several OIG complaints and a lawsuit against Westbrook (although she was not singled out from others in that Webber filed at least nine other complaints against other staff members)—nothing in the record shows that any supervisor, besides Jacobson, knew that Webber's treatment of Westbrook was not only aggressive but also racially offensive.

Finally, a plaintiff can satisfy the notice requirement also by showing the harassment is so pervasive that a jury could infer that someone at IDHS with authority to take action knew

about it.  *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 392 (7th Cir. 2010) ("Alternatively, [plaintiff] could have offered some evidence allowing a reasonable inference that supervisors . . . knew of the alleged racial harassment."); *Andonissamy*, 547 F.3d at 849 (To establish employer liability, plaintiff "would need to demonstrate that he notified the employer about the harassment *or* that the harassment was so pervasive that a jury could infer his employer knew about it.") (emphasis added); *Cerros,* 398 F.3d at 952 ("At bottom, the employer's knowledge of the misconduct is what is critical, not how the employer came to have that knowledge.").  Westbrook can show that some individuals in the William White unit knew or should have known about Webber's racist conduct.  For example, Webber's treatment team should have read about the three instances of Webber's racial conduct that Westbrook recorded in the progress notes.  (*See* Dkt. No. 42 at ¶ 16 ("One of the reasons Plaintiff is required to make chart entries is to alert a resident's treatment team to that resident's behavior . . . .").)  Also, Westbrook testified about specific instances where other staff members witnessed Webber's racially offensive treatment of Westbrook and where Webber called her racist names in public areas of the unit, such as the dayroom and dining hall.  At best, however, this evidence shows that the treatment team and some staff members knew about Webber's racially offensive conduct—not that someone above Jacobson on the IDHS chain of command knew, or should have known, about it. Again, this racially offensive conduct was the type of conduct that the staff members were trained to report and as such, without Westbrook's complaint, any progress notes might not stand out as being anything but the daily reporting of a mentally ill and delusional patient.

The evidence simply does not show that Westbrook took reasonable steps to bring her concerns of racial harassment to the attention of her supervisors or that IDHS otherwise should have known about it.  "Under Title VII, [] an employer's liability for coworker harassment is not triggered unless the employee notifies the employer about an instance of racial harassment."

*Vance*, 646 F.3d at 472; *see also Montgomery*, 626 F.3d at 391 ("Plaintiff must demonstrate that he made a concerted effort to inform [employer] of the racial harassment he was allegedly experiencing or that the harassment was sufficiently obvious to put [employer] on constructive notice."). Accordingly, summary judgment is appropriate on the fourth element as well.

### CONCLUSION

For the reasons stated above, IDHS' Motion for Summary Judgment [34] is granted.


Virginia M. Kendall
United States District Court Judge
Northern District of Illinois


Date: March 26, 2018